# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  59738-1-II |
| Respondent, | |
| v. | |
| ALEXANDRA MARIE LOCKHART, | PUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Following her arrest for several crimes, Alexandra M. Lockhart showed signs that she might not be competent to stand trial.  The superior court eventually ordered that she undergo competency restoration services from the Department of Social & Health Services (DSHS) pursuant to chapter 10.77 RCW.  DSHS, however, was unable to admit her to Western State Hospital for services within the timeframe ordered by the superior court.

Lockhart moved for contempt and requested sanctions against DSHS.  The superior court found DSHS in contempt but refused to order sanctions.  Lockhart appeals.

RCW 10.77.068 imposes deadlines on DSHS for admitting defendants to restoration services.  However, RCW 10.77.068(9) states, "This section does not create any new entitlement or cause of action related to the timeliness of competency to stand trial services, nor can it form the basis for contempt sanctions under chapter 7.21 RCW or a motion to dismiss criminal charges."  Because the superior court's order was based on, and tied to, RCW 10.77.068, which forecloses an award of sanctions for the failure to meet its deadlines, we hold that the trial court did not err in declining to impose sanctions.  Accordingly, we affirm.

FACTS

I. BACKGROUND OF THE *TRUEBLOOD* LITIGATION

Washington has long struggled to provide adequate services to criminal defendants who suffer from mental illness. Justice for the criminally accused requires that no defendant stands trial unless they are competent. *State v. P.E.T.*, 185 Wn. App. 891, 895, 344 P.3d 689 (2015). "Competence" is defined as being capable to understand the charges against you and being able to participate in your defense. *Id.* at 896. Our legislature has tasked DSHS with the responsibility to attempt to restore these defendants to competence. *See* RCW 10.77.010(8), .086(2), .088(2). This requires DSHS to admit some defendants to its custody for inpatient restoration services. *Id.*

DSHS has had challenges in promptly admitting these defendants. Nearly ten years ago, in *Trueblood v. Washington State Department of Social & Health Services*, the United States District Court for the Western District of Washington found that DSHS' delays in providing timely competency and restoration services were a violation of the constitutional rights of pretrial criminal detainees, and it issued a permanent injunction requiring DSHS to provide inpatient competency restoration within seven days. 101 F. Supp. 3d 1010, 1023-24 (W.D. Wash. 2015), *modified on recons.*, No. C14-1178 MJP, 2015 WL 1366403 (W.D. Wash. May 6, 2015) (court order), *modified*, No. C14-1178 MJP, 2016 WL4533611 (W.D. Wash. Feb. 8, 2016) (court order), *vacated and remanded*, 822 F.3d 1037 (9th Cir. 2016).

Among other findings, the *Trueblood* court found that "[a] correctional environment, calibrated to provide safety and order, is incongruous with the particular needs of the mentally ill, and results in people with confirmed or suspected mental illness spending more time in solitary confinement, where their mental health further deteriorates." 101 F. Supp. 3d at 1017. The district

court also found that defendants with mental illness suffer while incarcerated because: (1) they are not receiving treatment, (2) their symptoms of their mental illness become worse and more likely to be permanent due to the conditions of incarceration, (3) they are more likely to commit suicide, (4) they are likely to be targets of violence from other inmates, and (5) they are less likely to find a support network and therefore are likely to have increased feelings of isolation, terror, and despair. *Id.* at 1017-18.

The *Trueblood* litigation has been ongoing.[1] In 2018, the parties negotiated a settlement agreement and created a comprehensive plan to bring DSHS into compliance. *See* Amended Joint Motion for Preliminary Approval of Settlement Agreement, *A.B. by & through Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, No. 14-cv-01178-MJP (W.D. Wash. Oct. 25, 2018), https://www.dshs.wa.gov/sites/default/files/BHSIA/FMHS/Trueblood/2018Trueblood/599_1_A mendedAgreement.pdf [https://perma.cc/F84C-BKQK]. In 2023, the district court found that DSHS was still in contempt of the settlement agreement, and it ordered the agency to come into compliance and to pay sanctions. *A.B. by & through Trueblood*, 681 F. Supp. 3d 1149, 1155, 1179-80 (W.D. Wash. July 7, 2023). While the district court acknowledged some of DSHS' improvements, it found that DSHS "knowingly and inexcusably" continued to be in breach of the

---

[1] Since the initial decision in *Trueblood*, there have been ongoing attempts to enforce DSHS' compliance with the district court's permanent injunction. *See*, *e.g.*, *Trueblood*, No. C14-1178-MJP, 2016 WL 3632486 (W.D. Wash. July 7, 2016) (court order), (class members filed contempt motion against DSHS for violating permanent injunction); *Trueblood*, No. C14-1178 MJP, 2017 WL 4700326 (W.D. Wash. Oct. 19, 2017) (court order) (granting class members subsequent contempt motion); *A.B. by & through Trueblood*, 681 F. Supp. 3d 1149, 1179-80 (W.D. Wash. July 7, 2023) (found DSHS in breach of settlement agreement between September 2022 and May 2023). We refer to these actions collectively as "the *Trueblood* litigation."

settlement agreement due to the agency's own "lack of foresight, creativity, planning, and timely response to a crisis of its own making." *Id.*

Washington's failure to provide mental health services to criminal defendants greatly affects populations that have been historically marginalized. The average class member in *Trueblood* is a male, person of color who is: "living in desperate poverty; . . . experiencing homelessness or living without stable housing; . . . possessing little likelihood of employment; . . . suffering from a serious mental illness, which is most likely to include a psychotic diagnosis; . . . requiring substance use disorder treatment; and . . . for roughly one-third of the Class, likely living with a chronic physical disease." *Id.* at 1158. Moreover, their crimes tend to be less serious. *Id.* Most class members' crimes include "theft of food, indecent exposure for urinating or defecating in public due to the lack of an available restroom[], or trespassing on private property to sleep"—in other words, crimes stemming from their own poverty, homelessness, and underlying mental health conditions. *Id.*

## II. DELAYS TO LOCKHART'S RESTORATION

In July 2023, Lockhart was charged with felony harassment, fourth degree assault, and third degree theft. While the case was proceeding, the superior court found reason to doubt Lockhart's competency and ordered a competency evaluation. The resulting evaluation concluded that Lockhart was not competent to stand trial. So, on July 20, 2023, the superior court ordered Lockhart to undergo inpatient competency restoration in the custody of DSHS.

For the July order, the superior court used a pattern form, which included the following deadlines for her admission to DSHS custody:

> The defendant shall be transported and admitted to the treatment facility . . . by the earlier of 7 days of DSHS' receipt of this order or 14 days from signature of this order.

Clerk's Papers (CP) at 9.

Eight days after the superior court's order, DSHS sent a written notice that they would not be able to admit Lockhart to Western State Hospital for approximately five months. The notice explained that this delay was based on Lockhart's circumstances and DSHS' capabilities given "facility holds due to COVID-19, unexpected changes to patient admissions and discharges, and a variety of other factors." CP at 12.

Lockhart objected, alleging that DSHS was intentionally disobeying the superior court's order, violating RCW 10.77.068, and ignoring a federal mandate from the *Trueblood* litigation. Lockhart contended that DSHS violated her due process rights, and she moved for an order of contempt and the imposition of sanctions.

Lockhart requested both remedial sanctions and compensatory sanctions. She asked the superior court to impose $1,650 per day in remedial sanctions "until the contempt is purged" to be paid to Clark County Indigent Defense or to the Clark County Detention Center for legal services and programming for individuals with mental illness. And she requested compensatory sanctions under RCW 7.21.030(3) to compensate her for the ongoing harm and deterioration of her mental health resulting from the delay. Citing to the list of harms outlined in *Trueblood*, Lockhart alleged that the delays would cause "increases [to her] risk of suicide, victimization by other inmates, and make [her] mental illness more difficult to address." CP at 44. Lockhart also attached declarations from her parents that further alleged that if Lockhart had received timely treatment, she could have returned to work and earned approximately $700 per week.

DSHS objected, arguing that contempt was unwarranted because it was not intentionally or willfully disobeying the superior court's order. It was simply "unable to timely comply with the [c]ourt's order *despite* dedicated and concerted efforts to improve services and comply with all court orders for competency services." CP at 101.

DSHS also argued that the superior court should not impose any contempt sanctions under either its inherent authority or its statutory authority. It asserted that there was "no basis" to impose sanctions under the superior court's inherent authority. CP at 104. And the superior court could not use statutory authority because sanctions were precluded by the plain language of RCW 10.77.068(9)—language that also showed that DSHS had not waived its sovereign immunity. Finally, DSHS argued that even if it was not immune from sanctions, the superior court should not impose compensatory sanctions because Lockhart had not proven that she had suffered economic loss as a result of DSHS' conduct.

In October 2023, after hearing arguments, the superior court found DSHS in contempt. In the October order, the superior court cited to the reasoning in *Trueblood* where the federal district court "rejected claims by DSHS that budget and bed constraints made its failure to comply with the court's order unintentional." CP at 188-89. While the superior court acknowledged DSHS' "significant efforts" to provide competency services in a timely manner, it determined that "[a]t a certain point[, DSHS'] failure to engage in proper planning and resource allocation must be viewed as an intentional act." CP at 189.

But the superior court declined to impose sanctions, either remedial or compensatory. The superior court reasoned that the legislature had not waived its sovereign immunity under RCW

6

10.77.068(9) and, as an additional ground related to the request for compensatory sanctions, that Lockhart failed to prove she had suffered an actual loss.

At some point after the superior court's contempt ruling, Lockhart was admitted to DSHS custody to undergo competency restoration services. She was restored and determined to be competent on November 2, 2023.

Lockhart appeals the superior court's denial of sanctions.

ANALYSIS

Lockhart argues that the superior court erred when it concluded that it was unable to impose contempt sanctions against DSHS.

DSHS disagrees. DSHS argues that "[t]he unambiguous language in RCW 10.77.068(9) creates a statutory bar to the recovery of contempt sanctions and confirms that the [l]egislature did not waive sovereign immunity in this case." Br. of Resp't at 1.

Lockhart essentially responds that RCW 10.77.068 is not dispositive. Lockhart characterizes the superior court's basis for finding contempt as DSHS' intentional failure to comply with *the court's order*, not the statute. Because the superior court always has the inherent authority to compel compliance with its own orders, Lockhart contends that the superior court had the authority to sanction DSHS, notwithstanding the language of the statute. According to Lockhart, RCW 10.77.068 "says nothing about precluding sanctions for violating a court order or about limiting a court's inherent power to compel compliance with its orders through contempt sanctions." Appellant's Opening Br. at 13. Seen this way, neither RCW 10.77.068(9) nor the principles of sovereign immunity limit the superior court.

I.  THE BASIS OF THE COURT'S CONTEMPT ORDER

As framed by the parties, this dispute requires us to determine the basis of the superior court's October order finding DSHS in contempt.  If the superior court found DSHS to be in contempt based solely on a violation of RCW 10.77.068, then the language of the statute would more likely govern the superior court's authority.  On the other hand, if the superior court's basis was for a violation more generally of the terms of the superior court's order, then principles of the court's inherent authority would be more applicable.  Because the October contempt order was based on failure to comply with the underlying July order and its imposition of the deadlines for restoration services, this question is answered by looking at the July order and how narrowly it was based on RCW 10.77.068.

A.  STANDARD OF REVIEW

We review a court's authority to impose contempt sanctions de novo.  *In re the Int. of Silva*, 166 Wn.2d 133, 140, 206 P.3d 1240 (2009).  Courts are authorized to impose contempt sanctions under statutory authority or under their own inherent power to punish conduct that occurs in its presence or to enforce its own orders or judgments.  *State v. Ralph Williams' Nw. Chrysler Plymouth, Inc.*, 87 Wn.2d 327, 335, 553 P.2d 442 (1976).  Interpretation of a court's findings, conclusions, or judgments is a question of law.  *In re Marriage of Caven*, 136 Wn.2d 800, 809-10, 966 P.2d 1247 (1998).

B.  AMENDMENTS TO RCW 10.77.068

RCW 10.77.068 imposes deadlines on DSHS for admitting defendants to restoration services.  Given that this statute is critical to evaluating Lockhart's arguments, and DSHS' responses, about the superior court's orders, we start by tracing the recent history of the statute.

RCW 10.77.068 was adopted in 2012. The statute imposed "performance targets" for DSHS to admit defendants related to competency within "seven days or less" of receiving notice from the court. Former RCW 10.77.068(1)(a) (2012). However, subsection (5) stated,

> This section does not create any new entitlement or cause of action related to the timeliness of competency evaluations or admission for inpatient services related to competency to proceed or stand trial, nor can it form the basis for contempt sanctions under chapter 7.21 RCW[2] or a motion to dismiss criminal charges.

Former RCW 10.77.068(5) (2012).

Following the *Trueblood* litigation, RCW 10.77.068 has been amended several times by the legislature. In 2015, post-*Trueblood*, the legislature appeared to amend the statute to mirror the deadlines from the federal litigation by shifting the statute to impose a new "maximum time limit." *Compare* Former RCW 10.77.068 (2012), *with* Former RCW 10.77.068 (2015). A subsection of the statute was revised to read as follows:

> For a state hospital to extend an offer of admission to a defendant in pretrial custody for legally authorized inpatient restoration treatment related to competency:
>> (A) A performance target of seven days or less; and
>> (B) A maximum time limit of fourteen days

Former RCW 10.77.068(1)(a)(ii) (2015). While the legislature made this change, it chose to keep subsection (5) of the statute largely unaltered. Former RCW 10.77.068(5) (2015).

---

[2] Former RCW 7.21.030(2) (2001) provides:

> If the court finds that the person has failed or refused to perform an act that is yet within the person's power to perform, the court may find the person in contempt of court and impose . . . remedial sanctions [including imprisonment, per day financial forfeiture, an order designed to ensure compliance with a prior court order, or "any other remedial section" if the court finds the other options would be "ineffectual"].

The language of this subsection has remained unchanged and is the same in the current version of the statute. *Compare id.*, *with* RCW 7.21.030(2).

In 2022, the statute was amended again. The deadlines for admission to restoration were slightly altered and the subsections were renumbered. For example, subsection (5) was renumbered subsection (9).[3] But the legislature also made a conspicuous choice regarding the subsection that imposed deadlines for admission to restoration—the legislature directly inserted a reference to the prohibition on contempt sanctions (now in subsection (9)) into the specific subsection addressing the timelines for admission to restoration. The 2022 amendments revised the timeline provision (renumbered subsection (2)(a)) to read as follows:

> (2)(a) A maximum time limit of seven days as measured from the [DSHS'] receipt of the court order, or a maximum time limit of 14 days as measured from signature of the court order, whichever is shorter, is established to [extend an offer of admission to a defendant in pretrial custody for inpatient competency evaluation or inpatient competency restoration services], *subject to the limitations under subsection (9) of this section*.

Former RCW 10.77.068(2)(a) (2022) (emphasis added); *see also* SECOND SUBSTITUTE S.B. 5664, at 7-11, 67th Leg. Reg. Sess. (Wash. 2022). The language of subsections (2)(a) or (9) has not been altered since these amendments in 2022. *See* RCW 10.77.068.

C.  CHANGES TO PATTERN FORM ORDERS FOLLOWING *TRUEBLOOD* AND AMENDMENTS TO RCW 10.77

The pattern forms for the superior courts have similarly been revised to reflect these legislative amendments. Before April 2022, the pattern form expressly referenced the *Trueblood* litigation as authority for the deadline for DSHS to transport a defendant to a treatment facility; it provided,

---

[3] RCW 10.77.068(9) now reads, "This section does not create any new entitlement or cause of action related to the timeliness of competency to stand trial services, nor can it form the basis for contempt sanctions under chapter 7.21 RCW or a motion to dismiss criminal charges."

> The defendant shall be transported and admitted to the treatment facility by the earlier of 7 days of DSHS' receipt of this order or 14 days from the date of this order as required by statute and case law, including *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 101 F. Supp. 3d 1010 (W.D. Wash. 2015), *vacated on other grounds*, 822 F.3d 1037 (9th Cir. 2016); *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, No. C14-1178 MJP, 2017 WL 1488479, 2017 U.S. Dist. LEXIS 65532 (W.D. Wash. Apr. 26, 2017) (Order Adopting (in part) the Parties' Mediated Settlement Agreement).

Former Form MP 240, Order for Felony Competency Restoration Treatment (CRORIP, CROROP) at 4 (rev. Jan. 2022).

However, after the 2022 amendments to RCW 10.77.068, all references to *Trueblood* were removed from the pattern form "because it is no longer necessary with the legislative changes." Memorandum from Admin. Off. of Cts. to Superior Ct. & Dist. Ct. Judges & Comm'rs, Ct. Adm'rs, County Clerks, Prosecuting Att'ys, Def. Att'ys & L. Librs. 2 (Apr. 6, 2022) (Summary of Changes for Behavioral Forms, Based on Laws of 2022, Ch. 288 and Laws of 2022, Ch. 210). Here, the superior court's July restoration order used the current pattern form.[4]

D. APPLICATION

With this evolution of both the statute and the pattern form in mind, we return to the question of the basis for the superior court's October contempt order, which means, in turn, analyzing the basis of the underlying July order that imposed the deadlines.

As noted above, the superior court's July order for restoration used the pattern form that was revised after the 2022 amendments. *Compare* CP at 9, *with* Memorandum from Admin. Off.

---

[4] As recited in the facts above, the July order provided that "[t]he defendant shall be transported and admitted to the treatment facility within 7 days in compliance with RCW 10.77.086(1)(d) and by the earlier of 7 days of DSHS' receipt of this order or 14 days from signature of this order." CP at 9.

of Cts. at 2. The order required Lockhart's admission for restoration services "by the earlier of 7 days of DSHS' receipt of this order or 14 days from signature of this order." CP at 9. This language exactly mirrors the deadlines imposed by RCW 10.77.068; the July order includes no reference to the *Trueblood* litigation or any other source of authority. This suggests that the superior court's basis for its underlying order was rooted solely in the statute.

Our conclusion is limited to this specific order and the circumstances presented by our record. A differently drafted order might lead to a different conclusion. For example, if the superior court's July order was less tightly tied to the statute, like if the superior court had drafted its own order with alterations or extra provisions instead of using the pattern form, then the basis of the order would be more ambiguous. But the fact that the pattern form used by the superior court was amended to remain consistent with the provisions of RCW 10.77.068 (and exactly reflects the statute), drives the conclusion that the superior court's July order requiring restoration services within 7 or 14 days was, in fact, simply an order to follow the statute. Thus, it follows that when the superior court later found DSHS in contempt in October for failing to meet these restoration deadlines, the superior court's finding was squarely based on failure to follow the statute, not a more general violation of a court order, as Lockhart contends.

II. THE COURT'S ABILITY TO IMPOSE SANCTIONS

Having concluded that this specific July order (and, by extension, its subsequent October order of contempt) was narrowly based on DSHS' violation of RCW 10.77.068, we turn to the issue of whether the plain language of the statute precluded the superior court from imposing contempt sanctions. It clearly does.

The legislature has made it especially clear that sanctions should not flow from a violation of these statutory deadlines. As discussed above, subsection (9) of RCW 10.77.068 has, since before the 2022 amendments, prohibited the imposition of contempt sanctions for any violation of the entire section. And the deadlines for admission to restoration are found in subsection (2)(a), so subsection (9) would apply to those deadlines. *See* RCW 10.77.068(9). But in the 2022 amendments, the legislature went further to make its intent exceptionally clear—they expressly and conspicuously tied (arguably unnecessarily so) these deadlines to a prohibition of contempt sanctions. The legislature inserted language in subsection (2)(a) to declare with certainty that the deadlines are imposed "subject to the limitations under subsection (9) of this section." RCW 10.77.068(2)(a). The only reasonable conclusion from this 2022 addition is that although the legislature intended to impose clear deadlines, it, at the same time, wanted to *ensure* that DSHS could not be sanctioned for contempt if those deadlines were not met. Given that the basis for the superior court's July order was rooted in this statute, the plain language of subsection (9) prohibited the superior court from imposing of sanctions.

Notwithstanding this plain language, Lockhart reiterates that the statute should not prohibit sanctions here—citing to our Supreme Court's decision in *State v. Hand*.[5] Lockhart argues that *Hand* makes it "abundantly clear" that RCW 10.77.068(9) does not "function[] as a bar to contempt sanctions when [DSHS] intentionally ignores a court order related to competency restoration." Appellant's Reply Br. at 4 (citing *Hand*, 192 Wn.2d at 291).

---

[5] 192 Wn.2d 289, 429 P.3d 502 (2018).

In *Hand*, the superior court ordered DSHS to admit Hand for competency restoration within 15 days. 192 Wn. at 292. When DSHS failed to timely admit Hand, the superior court found the agency in contempt and imposed sanctions of a per/day financial penalty. *Id.* at 293. On appeal, our Supreme Court addressed the issues of whether detaining Hand for 76 days in pretrial detention before providing him competency restoration services violated his substantive due process rights under the Fourteenth Amendment, and whether the proper remedy for this violation was dismissal of Hand's charges with prejudice. *Id.* at 291. Largely citing to *Trueblood* and other similar federal cases, *Hand* held that such a delay did violate a defendant's rights to restorative treatment and to be free from incarceration, but that the proper remedy for a defendant's criminal case was not dismissal of criminal charges with prejudice. *Id.* at 298-99, 301. While the issue of sanctions was not extensively discussed, near the end of the opinion, it states that "[t]he trial court correctly imposed sanctions against [DSHS] for violating its contempt order." *Id.* at 301.

Lockhart notes that our Supreme Court included this language of approval for the sanctions even though when *Hand* was decided, RCW 10.77.068(9), and its prohibition on contempt sanctions, were included in the statute. From this, Lockhart concludes that RCW 10.77.068(9) cannot be seen as a bar to the superior court imposing sanctions here.

It is true that *Hand* has some similarities to this case. Nevertheless, we are unpersuaded that *Hand* requires us to ignore the express prohibitions of the statute. *Hand*'s focus was different. There, the primary issue was whether the length of delay violated the defendant's due process rights and whether the remedy should be dismissal of the charges with prejudice. *Hand*, 192 Wn.2d at 291. With the focus on the remedy for the defendant's criminal case, the local

prosecutor was a party to the case, not DSHS. And there is no analysis of the basis of the deadlines imposed in the superior court's underlying order and whether it was tied to the statute or not.

In fact, although the record is not entirely clear, we suspect the deadlines imposed in the underlying order in *Hand* were not tied to the statute. At the time of the superior court's order at issue in *Hand*, RCW 10.77.068 contained only "performance targets" (of 7 days) not mandatory deadlines. *Id.* at 294-95; Former RCW 10.77.068 (2012). And, there, the superior court ordered DSHS to admit Hand within 15 days, which was not consistent with the "performance targets." *Hand*, 192 Wn.2d at 292. Moreover, *Hand* characterizes the superior court contempt order as being based on the "failure to obey a court order," not for violation of the statute.[6] *Id.* at 293. Thus, because the superior court in *Hand* was not imposing deadlines found in the statute, it would not have been bound by the same statutory prohibitions against contempt sanctions that restrained the superior court here.

In addition, even assuming that the superior court in *Hand* based its finding of contempt at least in part on violations of the "performance targets" in RCW 10.77.068 (which is doubtful), the statute has undergone significant changes since then. Although Lockhart is correct that in 2018, when *Hand* was decided, RCW 10.77.068(9) was included in the statute, the legislative intent is

---

[6] Indeed, even though the form of the underlying order in *Hand* is not discussed in the opinion, the pattern forms in use immediately thereafter, at the time *Hand* was decided, were far less clear in terms of the source of the authority for the deadlines. As noted above, prior to the 2022 amendments, the pattern forms referenced the statute *and* case law, including *Trueblood* as authority for the deadlines. *See* Former Form MP 240, at 4 (imposing deadlines "as required by statute and case law, including [*Trueblood*]"). But after the 2022 amendments, the pattern forms omitted any other source of authority apart from the statute. Memorandum from Admin. Off. of Cts. at 2. Whatever form the superior court in *Hand* used for its order, it certainly did not use the pattern form that was created after these 2022 amendments.

much clearer now than it was then. In the 2022 amendments, passed three years after *Hand*, the legislature made it unquestionably clear that DSHS' failure to meet the deadlines to admit individuals for restoration could not be the basis for contempt sanctions. *See* RCW 10.77.068(2)(a) (overtly making the mandatory deadlines "subject to the limitations under subsection (9) of this section").

For these reasons, *Hand* does not support the broad assertion that a superior court may always impose sanctions based on DSHS' failure to timely provide competency restoration. But our opinion here does not strip superior courts of this ability either. The linchpin to this inquiry is the basis of the superior court's contempt finding and whether it is fairly considered to be based on, and narrowly tied to, violations of the statute or whether it is based more generally on a violation of other aspects of a court order.

Based on the specific facts of this case, the superior court's July order for Lockhart's admission to restoration was narrowly tied to RCW 10.77.068 and, thus, the October order of contempt was also narrowly tied to violating the statute. This ties the superior court to the prohibitions the legislature chose to include in RCW 10.77.068(9). The superior court did not err in concluding that it was unable to impose sanctions.[7]

---

[7] Because the superior court correctly decided that sanctions against DSHS were prohibited in this case, we do not address Lockhart's additional arguments regarding the scope of compensatory sanctions and whether she is entitled to them.

CONCLUSION

We acknowledge that grave harm results when defendants suffering from mental illness and needing restoration to competence are incarcerated in facilities that are focused on "[a] correctional environment" rather than being focused on their restoration. *Trueblood*, 101 F. Supp. 3d at 1017. We regret that, thus far, it appears that too few resources have been allocated to better serve these individuals and our criminal justice system.

And we also acknowledge that a thriving constitutionally-structured society requires three functioning branches of government, which requires, in turn, that our courts have the inherent authority to sanction disobedience with their orders.

However, when the superior court's order is narrowly imposing statutory requirements that the legislature has created for itself, this inherent authority of the courts is not necessarily implicated.[8] Consistent with principles of sovereign immunity, when the legislature chooses to condition the imposition of requirements with a prohibition on sanctions, we must respect that choice. In the case of deadlines for DSHS to admit defendants for restoration services as imposed by RCW 10.77.068, the legislature has done exactly that.

---

[8] Especially given the important rights implicated by in-custody restoration services, we emphasize the narrowness of our decision. Our holding is limited to our record and the specific language of the superior court's order. We do not hold that DSHS could never be properly sanctioned for failures related to competency restoration.

No. 59738-1-II

We affirm.

_____
PRICE, J.

We concur:

_____
MAXA, P.J.

_____
CHE, J.